Nos. 22-11014 & 22-11734

# In the United States Court of Appeals for the Eleventh Circuit

TANETHIA HOLDEN,

*Plaintiff-Appellant*,

v.

HOLIDAY INN CLUB VACATIONS INC.,

*Defendant-Appellee*,

and

MARK S. MAYER,

*Plaintiff-Appellant*,

v.

HOLIDAY INN CLUB VACATIONS INC.,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Middle District of Florida
(No. 6:19-cv-02373) (The Hon. Carlos E. Mendoza)
(No. 6:20-cv-02283) (The Hon. Gregory A. Presnell)

**BRIEF FOR THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, AMERICAN BANKERS ASSOCIATION, NATIONAL ASSOCIATION OF FEDERALLY-INSURED CREDIT UNIONS, INDEPENDENT COMMUNITY BANKERS OF AMERICA, AMERICAN FINANCIAL SERVICES ASSOCIATION, CREDIT UNION NATIONAL ASSOCIATION, MORTGAGE BANKERS ASSOCIATION, AND CONSUMER BANKERS ASSOCIATION AS AMICI CURIAE IN SUPPORT OF DEFENDANT-APPELLEE**

TARA S. MORRISSEY
JANET GALERIA
U.S. CHAMBER LITIGATION
CENTER
1615 H Street NW
Washington, DC 20062
(202) 463-5337

JEFFREY B. WALL
MORGAN L. RATNER
ZOE A. JACOBY
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW, Suite 700
Washington, DC 20006
(202) 956-7500
wallj@sullcrom.com

*(Additional counsel listed on next page)*

THOMAS PINDER
AMERICAN BANKERS ASSOCIATION
1120 Connecticut Avenue NW
Washington, DC 20036
(202) 663-5035

ANN C. PETROS
NATIONAL ASSOCIATION OF
FEDERALLY-INSURED CREDIT
UNIONS
3138 10th Street N
Arlington, VA 22201
(703) 842-2212

MICHAEL EMANCIPATOR
INDEPENDENT COMMUNITY
BANKERS OF AMERICA
1615 L Street NW, Suite 900
Washington, DC 20036
(202) 821-4469

PHILIP BOHI
AMERICAN FINANCIAL SERVICES
ASSOCIATION
919 18th Street NW, Suite 300
Washington, DC 20006
(202) 466-8605

ALEXANDER MONTERRUBIO
CREDIT UNION NATIONAL
ASSOCIATION
99 M Street SE, Suite 300
Washington, DC 20003
(202) 525-8558

JUSTIN WISEMAN
MORTGAGE BANKERS ASSOCIATION
1919 M Street NW
Washington, DC 20036
(202) 557-2854

DAVID POMMEREHN
CONSUMER BANKERS ASSOCIATION
1225 New York Avenue NW, Suite
1100
Washington, DC 20005
(202) 552-6368

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Amici curiae have no parent corporations, and no publicly traded companies own 10% or more of their stock.

Pursuant to Eleventh Circuit Rule 26.1, in addition to those identified in the other parties' briefs, the following persons and entities have an interest in the outcome of this appeal:

American Bankers Association

American Financial Services Association

Bohi, Philip

Chamber of Commerce of the United States of America

Consumer Bankers Association

Credit Union National Association

Emancipator, Michael

Galeria, Janet

Independent Community Bankers of America

Jacoby, Zoe A.

Monterrubio, Alexander

Morrissey, Tara S.

Mortgage Bankers Association

National Association of Federally-Insured Credit Unions

Petros, Ann

Pinder, Thomas

Pommerehn, David

Ratner, Morgan L.

Sullivan & Cromwell LLP

Wall, Jeffrey B.

Wiseman, Justin

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT......................................................C-1

IDENTITY AND INTEREST OF AMICI CURIAE ......................................1

STATEMENT OF THE ISSUE...................................................................5

INTRODUCTION AND SUMMARY OF ARGUMENT .............................5

ARGUMENT .............................................................................................6

I.   THE FCRA ADDRESSES FACTUAL INACCURACIES, NOT LEGAL DISPUTES...............................................................................6

    A.   The FCRA's Text Requires Furnishers And CRAs To Investigate Only Factual Accuracy....................................................8

    B.   The FCRA's Structure, Purpose, And History Confirm The Textual Focus On Factual Accuracy......................................14

    C.   This Court And Others Have Correctly Interpreted The FCRA.............................................................................................17

II.   THE BUREAU'S CONTRARY APPROACH IS UNWORKABLE AND INEFFICIENT.............................................21

    A.   Distinguishing Between Fact And Law Is A Familiar Task For Courts......................................................................................22

    B.   The Bureau's Approach Is Unsound...............................................26

CONCLUSION........................................................................................33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Batterman* v. *BR Carroll Glenridge, LLC*,
829 Fed. Appx. 478 (11th Cir. 2020)..................................7, 18, 19, 20

*Bowling* v. *U.S. Bank Nat'l Ass'n*,
963 F.3d 1030 (11th Cir. 2020).......................................................20

*BP Am. Prod. Co.* v. *Burton*,
549 U.S. 84 (2006).......................................................................8

*Cahlin* v. *General Motors Acceptance Corp.*,
936 F.2d 1151 (11th Cir. 1991).....................................................31

*Carvalho* v. *Equifax Info. Servs., LLC*,
629 F.3d 876 (9th Cir. 2010)...............................................14, 19, 20

*Chiang* v. *Verizon New England Inc.*,
595 F.3d 26 (1st Cir. 2010) ...........................................................20

*Chuluunbat* v. *Experian Info. Sols., Inc.*,
4 F.4th 562 (7th Cir. 2021) .......................................................24, 25

*Cornock* v. *Trans Union LLC*,
638 F. Supp. 2d 158 (D.N.H. 2009) ............................................23, 24

*DeAndrade* v. *Trans Union LLC*,
523 F.3d 61 (1st Cir. 2008) ...................................................19, 26, 27

*Denan* v. *Trans Union LLC*,
959 F.3d 290 (7th Cir. 2020).................................................*passim*

*Dennis* v. *BEH-1, LLC*,
520 F.3d 1066 (9th Cir. 2008)........................................................25

*Felts* v. *Wells Fargo Bank, N.A.*,
893 F.3d 1305 (11th Cir. 2018).........................................................7

*Gross* v. *CitiMortgage, Inc.*,
33 F.4th 1246 (9th Cir. 2022) ................................................20, 21, 27

*Holiday Inn Club Vacations, Inc.* v. *Granger*,
2018-CA-011778-O (Fla. 9th Cir. Ct. Mar. 15, 2021)....................28

*Humphrey* v. *Trans Union LLC,*
   759 Fed. Appx. 484 (7th Cir. 2019)................................................27

*\*Hunt* v. *JPMorgan Chase Bank, N.A.,*
   770 Fed. Appx. 452 (11th Cir. 2019)........................................*passim*

*\*Losch* v. *Nationstar Mortgage LLC,*
   995 F.3d 937 (11th Cir. 2021)................................................*passim*

*\*Mader* v. *Experian Info. Sols., Inc.,*
   56 F.4th 264 (2d Cir. 2023)...........................................9, 19, 25, 27

*McIvor* v. *Credit Control Servs., Inc.,*
   773 F.3d 909 (8th Cir. 2014)................................................32

*Merck Sharp & Dohme Corp.* v. *Albrecht,*
   139 S. Ct. 1668 (2019) ......................................................22

*Miller* v. *Fenton,*
   474 U.S. 104 (1985)..........................................................23

*Orange Lake Country Club, Inc.* v. *Arndt,*
   2016-CA-6342 (Fla. 9th Cir. Ct. Aug. 14, 2019) ............................28

*Teva Pharm. USA, Inc.* v. *Sandoz, Inc.,*
   574 U.S. 318 (2015)..........................................................23

*Trans Union LLC* v. *FTC,*
   536 U.S. 915 (2002)..........................................................30

*U.S. Bank N.A.* v. *Village at Lakeridge,*
   138 S. Ct. 960 (2018) ........................................................23

*United States* v. *Oliveros,*
   275 F.3d 1299 (11th Cir. 2001)..............................................22

*Wright* v. *Experian Info. Sols., Inc.,*
   805 F.3d 1232 (10th Cir. 2015)............................................19, 29

**Statutes and Regulations:**

15 U.S.C.
   § 1681(a)(1)................................................................14
   § 1681e....................................................................19
   *\*§ 1681i...............................................................passim*
   § 1681n..................................................................7, 30

§ 1681o.............................................................................................7, 30

§ 1681s-2(a) ............................................................................................12

*§ 1681s-2(b) ...................................................................................*passim*

Pub. L. No. 104-208, 110 Stat. 3009 (1996) ....................................15

12 C.F.R.
    § 1022.41 ............................................................................................13
    § 1022.43 ............................................................................................13

## Legislative Materials:

115 Cong. Rec. 2410 (1969) .........................................................15, 16

142 Cong. Rec. S11869 (daily ed. Sept. 30, 1996) ............................6

## Other Authorities:

*American Heritage Dictionary of the English Language* (5th
    ed. 2018) ..........................................................................................8, 9

*Fair Credit Reporting Act Suits Have Soared Over Last
    Decade*, Law 360 (Oct. 22, 2019),
    https://www.law360.com/articles/1210252/fair-credit-
    reporting-act-suits-have-soared-over-last-decade...................................30

*Merriam-Webster's Collegiate Dictionary* (10th ed. 2001)...............9, 10, 11

*Taskforce on Federal Consumer Financial Law Report* 103
    (Jan. 2021), https://files.consumerfinance.gov/f/documents/
    cfpb_taskforce-federal-consumer-financial-law_report-
    volume-1_2022-01_amended.pdf .................................................31

Pursuant to Eleventh Circuit Rule 28-1(e), asterisks identify the citations upon which amici primarily rely.

## IDENTITY AND INTEREST OF AMICI CURIAE

The Chamber of Commerce of the United States of America is the world's largest business federation. The Chamber directly represents approximately 300,000 members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every economic sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members by participating as an amicus curiae in cases, like this one, that raise issues of concern to the nation's business community.

The American Bankers Association (ABA) is the principal national trade association of the financial services industry in the United States. Founded in 1875, ABA is the voice for the nation's $23.7 trillion banking industry and its more than two million employees. ABA members provide banking services in each of the fifty States and the District of Columbia. Among them are banks, savings associations, and non-depository trust companies of all sizes. ABA frequently submits amicus curiae briefs in state and federal courts in matters that significantly affect its members and the business of banking.

The National Association of Federally-Insured Credit Unions (NAFCU) advocates for all federally-insured not-for-profit credit unions that, in turn,

serve over 134 million consumers with personal and small business financial service products. The association provides members with representation, information, education, and assistance to meet the constant challenges that cooperative financial institutions face in today's economic environment. NAFCU proudly represents many smaller credit unions with relatively limited operations, as well as many of the largest and most sophisticated credit unions in the Nation. NAFCU represents 78 percent of total federal credit union assets and 63 percent of all federally-insured credit union assets.

The Independent Community Bankers of America (ICBA) creates and promotes an environment where community banks flourish. ICBA is dedicated exclusively to representing the interests of the community banking industry and its membership through effective advocacy, best-in-class education, and high-quality products and services. With nearly 50,000 locations nationwide, community banks constitute roughly 99 percent of all banks, employ nearly 700,000 Americans, and are the only physical banking presence in one in three U.S. counties. Holding nearly $5.9 trillion in assets, over $4.9 trillion in deposits, and more than $3.5 trillion in loans to consumers, small businesses, and the agricultural community, community banks channel local deposits into the Main Streets and neighborhoods they serve, spurring

job creation, fostering innovation, and fueling their customers' dreams in communities throughout America.

The American Financial Services Association (AFSA), founded in 1916, is the national trade association for the consumer credit industry, protecting access to credit and consumer choice. AFSA members provide consumers with many kinds of credit, including traditional installment loans, mortgages, direct and indirect vehicle financing, payment cards, and retail sales finance.

Credit Union National Association (CUNA) is the largest trade association serving and representing the nation's 5,000 credit unions and their 130 million members. CUNA advocates for credit unions before Congress, state and federal agencies, and the courts.

The Mortgage Bankers Association (MBA) represents more than 2,200 member companies in the real estate finance industry, including federally-chartered banks and savings associations. The MBA works to ensure the continued strength of the nation's residential and commercial real estate markets; to expand homeownership; and to extend access to affordable housing for all Americans.

The Consumer Bankers Association (CBA) is the only national financial trade group focused exclusively on retail banking and personal financial

services—banking services geared toward consumers and small businesses. As the recognized voice on retail banking issues, CBA provides leadership, education, research, and federal representation for its members. CBA members include the nation's largest bank holding companies as well as regional and super-community banks that collectively hold two-thirds of the total assets of depository institutions.

Amici have a significant interest in this case. Their members include information furnishers and consumer reporting agencies covered by the Fair Credit Reporting Act (FCRA). The scope of the FCRA's command to investigate the accuracy of consumers' credit files is of immense importance to those members. As explained below, proposals to expand the FCRA's obligations and require furnishers and consumer reporting agencies to adjudicate legal disputes would raise operating costs and lead to unpredictable and unwarranted legal liability.[1]

---

[1]  The parties have consented to the filing of this brief. No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund the preparation or submission of this brief; and no person other than the amici, their members, or their counsel contributed money that was intended to fund preparing or submitting the brief.

## STATEMENT OF THE ISSUE

Whether the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b), requires a furnisher to investigate the factual accuracy of reported information, or also to assess and resolve legal disputes.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Under the Fair Credit Reporting Act (FCRA), consumer reporting agencies (CRAs) and the entities that furnish information to them—called furnishers—have a duty to investigate whether disputed information in a credit file is "accura[te]."  15 U.S.C. §§ 1681i(a)(1)(A), 1681s-2(b)(1).  If the information is "inaccurate or incomplete or cannot be verified," it must be modified or removed.  15 U.S.C. § 1681s-2(b)(1)(E).  For years, courts around the country—including this one—have held that the FCRA requires furnishers and CRAs to investigate and remove factually inaccurate information, but not to correctly resolve all legal disputes about a debt.

These consolidated cases illustrate why.  Both Plaintiffs purchased timeshares from Holiday Inn Club Vacations and took out loans to pay for those timeshares.  They made several loan payments before notifying Holiday Inn that they no longer intended to continue paying.  Plaintiffs apparently believed that, under their purchase agreements, their defaults released them of any further payment obligations.  Holiday Inn interpreted the agreements

5

differently and continued to report that Plaintiffs owed money for their timeshare purchases. Florida courts have since divided over whether Plaintiffs or Holiday Inn has the better reading. But rather than litigate that contract dispute directly, Plaintiffs sued Holiday Inn under the FCRA for furnishing "inaccurate" information about their debts.

Plaintiffs, joined by the Consumer Financial Protection Bureau as amicus, argue that the FCRA requires furnishers like Holiday Inn not merely to investigate potential factual errors but also to resolve legal disputes.[2] They are wrong: credit personnel must get to the bottom of factual *inaccuracies*, not debatable legal arguments. This Court has already concluded as much, and its decisions accord with the FCRA's text, structure, purpose, and history. The contrary proposal advanced by Plaintiffs and the Bureau is neither sensible nor workable.

## ARGUMENT

## I.   THE FCRA ADDRESSES FACTUAL INACCURACIES, NOT LEGAL DISPUTES

The FCRA provides that a furnisher who receives notice "of a dispute with regard to the completeness or accuracy of any information provided . . .

---

[2] The Federal Trade Commission joins the Bureau, but for convenience we refer to it as the Bureau's brief.

to a consumer reporting agency" shall "conduct an investigation with respect to the disputed information." 15 U.S.C. § 1681s-2(b). If a consumer believes that the furnisher has not made a reasonable investigation, she may sue for damages—including punitive damages for willful violations—and attorney's fees. 15 U.S.C. §§ 1681n(a), 1681o(a). To prevail on that FCRA claim, a plaintiff must establish that if the defendant had "conducted a reasonable investigation, the result would have been different; *i.e.*, that the furnisher would have discovered that the information it reported was inaccurate or incomplete." *Felts* v. *Wells Fargo Bank, N.A.*, 893 F.3d 1305, 1313 (11th Cir. 2018).

The text, structure, history, and purpose of the FCRA all demonstrate that the statute requires furnishers and CRAs to investigate and verify factual accuracy, not assess or resolve legal disputes. This Court has already reached that conclusion under the provision outlining the investigation obligations of CRAs, 15 U.S.C. § 1681i(a). *See Losch* v. *Nationstar Mortg. LLC*, 995 F.3d 937, 946 (11th Cir. 2021); *Batterman* v. *BR Carroll Glenridge, LLC*, 829 Fed. Appx. 478, 481-482 (11th Cir. 2020). And in an unpublished opinion, it has reached the same conclusion for the similarly worded provision at issue here, which covers data furnishers, 15 U.S.C. § 1681s-2(b). *See Hunt* v. *JPMorgan*

*Chase Bank, N.A.*, 770 Fed. Appx. 452, 458 (11th Cir. 2019). As the Court put it in *Hunt*, a "plaintiff must show a *factual inaccuracy* rather than the existence of *disputed legal questions* to bring suit against a furnisher under § 1681s-2(b)." *Id.* (emphases added).

## A.    The FCRA's Text Requires Furnishers And CRAs To Investigate Only Factual Accuracy

Plaintiffs and the Bureau both argue that "[n]othing in the statutory text contemplates a distinction between 'legal' inaccuracies and 'factual' inaccuracies." Pltfs. Br. 14; *see* Bureau Br. 16. That is incorrect. A careful examination of the FCRA's text demonstrates that Congress required furnishers and CRAs to investigate factual inaccuracies, not legal disputes.

1.    Section 1681s-2(b)(1) requires furnishers to investigate information whose "completeness or accuracy" is disputed, and to modify or delete any "item of information" "found to be *inaccurate or incomplete*" (emphasis added). The key textual question is what it means for an "item of information" in a credit file to be "inaccurate or incomplete." Because the statute does not define those terms, they take their ordinary meaning. *BP Am. Prod. Co.* v. *Burton*, 549 U.S. 84, 91 (2006). "Inaccurate," means, of course, "not accurate." And "accurate" means "[c]onforming exactly to fact; errorless." *American Heritage Dictionary of the English Language* 12

8

(5th ed. 2018).[3] Similarly, "incomplete" means "not complete," and "complete" means "[h]aving all necessary or normal parts, components, or steps." *Id.* at 377.

Asking whether credit information conforms exactly to fact or truth, or has no errors, or contains all necessary parts, applies most naturally to matters of *fact*. As the Second Circuit recently explained, "[t]his definition requires a focus on objectively and readily verifiable information." *Mader* v. *Experian Info. Sols., Inc.*, 56 F.4th 264, 269 (2d Cir. 2023). It thus excludes circumstances in which the parties debate a legal question that "evades objective verification." *Id.*

Here, for example, Holiday Inn furnished factual information that Holden owed over $25,000 to Holiday Inn, and that Mayer owed over $10,000 to Holiday Inn. If the true outstanding balance on Holden's loan had been $2,500, or if Holiday Inn had attributed a debt to "Mark Mayer" that was owed by "Mike Mayer," it would be natural to say that Holiday Inn had reported "inaccurate" or "incomplete" information. But it would not be natural to say

---

[3]  Accuracy meant the same thing in 1996 when the FCRA was amended to add Section 1681s-2 to the statute. *See Merriam-Webster's Collegiate Dictionary* 8 (10th ed. 2001) (defining "accurate" as "free from error esp. as the result of care; conforming exactly to truth or to a standard").

so because Holden and Mayer contest whether a frequently litigated liquidated-damages provision should be interpreted to excuse any future payment obligations. An "ordinary person," Pltfs. Br. 18, might describe the reported debt there as disputed or even potentially invalid. But ordinary people use terms like accuracy and completeness to describe whether information reflects correct and full facts—not whether someone has an arguable legal defense to the debt.

2. Even if "inaccuracy" can sometimes be construed to cover both factual and legal error, in the context of the FCRA it should be limited to its ordinary meaning of "conforming to fact." The surrounding statutory language repeatedly speaks in terms that apply most naturally to factual disputes. For example, the FCRA requires furnishers and CRAs to "investigat[e]" and "reinvestigat[e]" disputed information. 15 U.S.C. §§ 1681i(a)(1)(A), 1681s-2(b)(1)(A). To "investigate" is "to observe or study by close examination and systematic inquiry." *Merriam-Webster's Collegiate Dictionary* 615 (10th ed. 2001). Facts can be "observe[d]" or "inquir[ed]" into, but we do not normally refer to laws that way.

The FCRA also directs furnishers and CRAs to conduct an investigation so that they can determine whether the disputed information can "be

10

verified"—and to remove an item if it cannot be verified. 15 U.S.C. §§ 1681i(a)(5)(A), 1681s-2(b)(1)(E). Like the word "investigate," the word "verify" connotes an inquiry into knowable facts or objective truth. *See Merriam-Webster's Collegiate Dictionary* 1308 (10th ed. 2001) (defining "verify" as "to establish the truth, accuracy, or reality of"). Here, it would be strange to suggest that Holiday Inn's credit personnel could objectively "verif[y]" whether Holden and Mayer were legally responsible for the debt in the face of competing contract interpretations. And it would be stranger still if, whenever any legal dispute exists about a debt, the debt becomes unverifiable and must be removed from a credit report.

Other surrounding terms provide further evidence that the statute requires furnishers and CRAs to look for factual inaccuracies, not assess or resolve legal disputes. For example, the statute requires CRAs to "determine whether" disputed information is inaccurate, and it contemplates that furnishers may "find[] that" disputed information is inaccurate. §§ 1681i(a)(1)(A), 1681s-2(b)(1)(D). CRAs and furnishers can readily "determine" and "find" whether disputed information is *factually* error-free. But only courts of law have the capacity to conclusively "determine" or "find" that information in a credit file is legally valid. *See Denan* v. *Trans Union*

11

*LLC*, 959 F.3d 290, 295 (7th Cir. 2020) ("Only a court can fully and finally resolve the legal question of a loan's validity."). At every turn, the statutory language supports a duty to investigate factual inaccuracies, not to resolve legal disputes.

3. Plaintiffs contend (at 20-21) that two other provisions of Section 1681s-2 "actually require[] furnishers to accurately report specific 'legal' information." But the provisions they cite do not require furnishers to resolve legal disputes. One provision allows financial institutions to remove a "default regarding a private education loan" from a credit file if the consumer has participated in a loan-rehabilitation program. 15 U.S.C. § 1681s-2(a)(1)(E)(i). The other requires furnishers to report certain accounts as "current" for consumers who received a particular "accommodation" during the COVID-19 pandemic. *Id.* § 1681s-2(a)(1)(F)(ii). Whether a consumer participated in a loan-rehabilitation program or received an accommodation is a *factual* question. Neither provision suggests that the FCRA requires furnishers to resolve legal disputes—let alone resolve them correctly.

Plaintiffs and the Bureau also seek support in Bureau regulations interpreting a *different* statutory provision, Section 1681s-2(a). As they recognize, however, Section 1681s-2(a) is not at issue, and the regulations they

cite thus do not actually apply.  Pltfs. Br. 24 n.8; Bureau Br. 17 n.13.  The Bureau cannot assume that its regulations construing an inapplicable statutory provision are reasonable, and parlay those inapplicable (and thus unchallenged) regulations into the appropriate construction of the statutory provision here.  Moreover, the Bureau's new made-for-litigation reading of its own regulations would not merit deference even in a case in which those regulations actually applied.  The regulations define "accuracy" to require, among other things, the correct reporting of "the terms of and liability for the account," 12 C.F.R. § 1022.41(a)—a description that, in isolation, could encompass legal disputes.  But they elaborate with examples that overwhelmingly focus on factual accuracy.  *See id.* § 1022.43(a) (disputes about "terms of a credit account" include "the type of account, principal balance, scheduled payment amount on an account, or the amount of the credit limit"; disputes about "consumer's liability" include "whether there [] has been identity theft or fraud against the consumer, whether there is individual or joint liability on an account, or whether the consumer is an authorized user").  The regulations thus do not reasonably construe the term "accuracy" to cover disputed legal questions.

**B.    The FCRA's Structure, Purpose, And History Confirm The Textual Focus On Factual Accuracy**

1.    The FCRA's structure and purpose reinforce the natural reading of the statutory text.  Congress explained that the statute was designed to ensure "fair and accurate credit reporting," because "[i]naccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine . . . public confidence."  15 U.S.C. § 1681(a)(1). Accordingly, the FCRA's provisions work together to ensure that the information in a consumer's credit report accurately represents her creditworthiness.  Furnishers have a circumscribed role under that scheme: they must reasonably investigate disputed information to guard against mistakes in a consumer's report, and they must omit certain information from reports following a consumer's direct dispute.  15 U.S.C. § 1681s-2.  The regime proposed by Plaintiffs and the Bureau would turn Congress's careful credit-reporting scheme into a debt-adjudication system, under which consumers may mount impermissible "collateral attacks on the legal validity of their debts in the guise of FCRA" claims.  *Carvalho* v. *Equifax Info. Servs., LLC*, 629 F.3d 876, 891 (9th Cir. 2010).

Suppose a consumer complains about the mortgage balance on her credit report.  Furnishers reasonably could (and are required to) investigate

14

whether the amount is accurate, whether it is still owed by the consumer, and the like. But now suppose the consumer's complaint is that her debt is unenforceable under state law because of a state usury statute. The consumer's proper course of action would be to sue the company, asking a court to issue a declaratory judgment or to enjoin the mortgage obligation. Under the Bureau's regime, however, the consumer could frame her legal challenge as an "inaccuracy" under the FCRA, and sue the furnisher for failing to reasonably investigate the "inaccuracy"—just as Plaintiffs did here. Furnishers would thus need to substitute for courts and make a judgment about the debt's permissibility under the state statute, on pain of damages and attorney's fees. None of that can be fairly derived from a statute meant to prevent and correct factual reporting errors.

2.    The FCRA's legislative history further confirms Congress's focus on factual inaccuracies, not legal disputes. The original Fair Credit Reporting Act of 1970 was introduced in the Senate by a bipartisan group of Senators, to "protect consumers against arbitrary, erroneous, and malicious credit information." 115 Cong. Rec. 2410 (1969) (statement of Senator Proxmire). Sponsoring Senator William Proxmire outlined the five types of inaccuracy that the bill was designed to target: confusion over individuals with similar

15

names; biased information; malicious gossip; computer errors; and incomplete information.  *Id.* at 2411.  Each of those categories was intended to be factual in nature.  For example, when discussing "incomplete information," Senator Proxmire mentioned credit reports that omitted delayed-payment agreements reached between consumers and their creditors, dropped charges, or favorable court judgments.  *Id.* at 2411-2412.

The discussion around later FCRA amendments was similar.  In 1996, Congress passed the Consumer Credit Reporting Reform Act, which created obligations for furnishers and added the provision at issue in this case, Section 1681s-2(b).  Pub. L. No. 104-208, § 2413, 110 Stat. 3009-448 (1996).  Congress was motivated to amend the statute due to concern with "human error or computer error."  142 Cong. Rec. S11869 (daily ed. Sept. 30, 1996) (statement of Senator Bryan).  Members of Congress heard extensive testimony about distinctly factual errors, like the story of Mary Lou Mobley, whose credit report reflected that she was married to a financially troubled man from Arizona, even though she had never been married or been to Arizona.  *Id.*  In sum, the legislative history underscores the text's focus on factual accuracy.

16

### C.  This Court And Others Have Correctly Interpreted The FCRA

Consistent with the FCRA's text, structure, purpose, and history, this Court and many of its sister circuits have recognized that the FCRA focuses on factual inaccuracies.

1. In interpreting the same provision of the FCRA at issue here, this Court has recognized that "a plaintiff must show a factual inaccuracy rather than the existence of disputed legal questions to bring suit against a furnisher under § 1681s-2(b)." *Hunt*, 770 Fed. Appx. at 458. In *Hunt*, the plaintiff challenged a furnisher's reporting of his delinquent monthly mortgage payments by arguing that, under Florida law, he no longer had to make those payments after the bank filed a foreclosure action. In a well-reasoned but unpublished opinion, issued after briefing on this question, the Court concluded that the plaintiff's FCRA claim failed because his challenge amounted to "a currently unresolved legal, not a factual, question." *Id.*

Plaintiffs attempt (at 26) to dismiss *Hunt*'s conclusion as "dicta," because the court "first determined . . . that there was no inaccuracy at all— legal or factual." They misread the opinion. This Court indeed expressed skepticism about the plaintiff's state-law argument, noting that it was "unconvinced." 770 Fed. Appx. at 458. But the Court then explained that the

17

merits of plaintiff's state-law argument did not matter because, "even assuming [the plaintiff] ultimately turned out to be correct about his legal obligation to pay, his FCRA argument fails nonetheless [because a] plaintiff must show a factual inaccuracy rather than the existence of disputed legal questions to bring suit against a furnisher under § 1681s-2(b)." *Id.* That explanation was not mere dicta. It was at the very least an alternative ground, and arguably the key basis for the Court's decision.

This Court has drawn the same fact-law distinction in interpreting the similarly worded provisions of the FCRA that govern CRAs. In *Batterman*, the Court rejected a plaintiff's FCRA claim premised on the argument that he was not legally liable for the liquidated damages included in his credit report. 829 Fed. Appx. at 481-482. And then in *Losch*, the Court reaffirmed in a published opinion that a plaintiff must show "factually inaccurate information," and that "a reasonable reinvestigation . . . does not require [CRAs] to resolve legal disputes about the validity of the underlying debts they report." 995 F.3d at 944-946. Although the Court ultimately found that the credit information was factually inaccurate, the relevant point is that it distinguished between factual inaccuracy and legal invalidity.

18

2.    Consistent with this Court's decisions in *Batterman* and *Losch*, the five other courts of appeals to consider the question—the First, Second, Seventh, Ninth, and Tenth Circuits—have held that a CRA's obligations under Sections 1681e and 1681i extend only to "factually inaccurate information, as consumer reporting agencies are neither qualified nor obligated to resolve legal issues." *Denan*, 959 F.3d at 296-297; *see Mader*, 56 F.4th at 270 (explaining that "claims under the FCRA require factual inaccuracies to be actionable"); *DeAndrade* v. *Trans Union LLC*, 523 F.3d 61, 68 (1st Cir. 2008) (distinguishing between "a factual inaccuracy" and "a legal issue that a credit agency" "is neither qualified nor obligated to resolve under the FCRA"); *Carvalho*, 629 F.3d at 892 (holding that CRAs need not "provide a legal opinion on the merits"); *Wright* v. *Experian Info. Sols., Inc.*, 805 F.3d 1232, 1242 (10th Cir. 2015) (explaining that CRAs are not required to "resolve legal disputes about the validity of the underlying debts they report"). The Second Circuit joined that list just over a month ago, after carefully examining the "ordinary meaning" of "accuracy" under the FCRA. *Mader*, 56 F.4th at 269.

The issue has been litigated somewhat less frequently in suits against furnishers under Section 1681s-2(b). The First Circuit has held that in that context, "just as in suits against CRAs, a plaintiff's required showing is *factual*

inaccuracy, rather than the existence of disputed legal questions." *Chiang* v. *Verizon New England Inc.*, 595 F.3d 26, 38 (1st Cir. 2010). And this Court reached the same conclusion in *Hunt*, relying in part on *Chiang*. That conclusion makes sense: Section 1681s-2(b), which governs furnishers, uses the same "inaccurate" language as Section 1681i, which governs CRAs. And "identical words and phrases within the same statute should normally be given the same meaning." *Bowling* v. *U.S. Bank Nat'l Ass'n*, 963 F.3d 1030, 1038 (11th Cir. 2020).

The Ninth Circuit is the sole court of appeals to reach the opposite conclusion in a furnisher case. It recently accepted the Bureau's argument that the "FCRA will sometimes require furnishers to investigate, and even to highlight or resolve, questions of legal significance." *Gross* v. *CitiMortgage, Inc.*, 33 F.4th 1246, 1253 (9th Cir. 2022). But the Ninth Circuit previously adopted the distinction between factual inaccuracies and legal disputes in *Carvalho*, and *Gross* offers no textual justification for the different results. This Court should not abandon *Hunt*, *Losch*, and *Batterman* in favor of *Gross*'s atextual and anomalous rule.

Both Plaintiffs and the Bureau emphasize *Gross* and discount the near-unanimous line of cases distinguishing between factual inaccuracies and legal

20

disputes on the ground that many involved CRAs, not furnishers. *See* Pltfs. Br. 7, 17; Bureau Br. 17-21. But like the Ninth Circuit in *Gross*, they provide no textual basis for drawing a distinction between Sections 1681s-2(b) and 1681i. Every one of their textual arguments would apply equally to CRAs and to furnishers—as Plaintiffs and the Bureau acknowledge. Pltfs. Br. 21; Bureau Br. 20 n.16.

*     *     *

The Bureau urges this Court to "hold that there is no exemption in the FCRA's reasonable investigation requirement for legal questions." Br. 25. It is right, in a sense. This Court need not craft an atextual "exemption" from the FCRA for legal disputes. Instead, the statute's text, structure, purpose, and history all confirm that the reasonable-investigation provisions, including Section 1681s-2(b)(1), address only challenges to factual accuracy. As a result, and as this Court and others have recognized, a "plaintiff must show a factual inaccuracy rather than the existence of disputed legal questions to bring suit" under the statute. *Hunt*, 770 Fed. Appx. at 458.

## II. THE BUREAU'S CONTRARY APPROACH IS UNWORKABLE AND INEFFICIENT

The Bureau also urges the Court to abandon its distinction between factual inaccuracies and legal disputes on the ground that it will be

21

unworkable. The Bureau is wrong. This Court's existing rule is administrable and is already operating well in courts around the country. On the contrary, it is *the Bureau*'s reading that is unworkable, expensive, and inefficient. It would have damaging economic consequences for furnishers, CRAs, and consumers alike.

### A. Distinguishing Between Fact And Law Is A Familiar Task For Courts

The Bureau contends that it will be "difficult[]" for courts deciding FCRA cases to determine whether a plaintiff has asserted a factual inaccuracy or a legal dispute. *See* Br. 23-25. But courts routinely distinguish between factual and legal matters in a variety of contexts. And with respect to the FCRA specifically, courts across the country already distinguish between factual and legal issues without the chaos that the Bureau imagines.

1. Distinguishing between fact and law is a common task for federal courts. District courts, for example, distinguish between fact and law whenever they determine which issues they must decide and which must be reserved for a jury. *See Merck Sharp & Dohme Corp.* v. *Albrecht*, 139 S. Ct. 1668, 1679 (2019). Once the case proceeds to trial, a district court must instruct the jury on relevant issues of law and permit juries to decide questions of fact. *See United States* v. *Oliveros*, 275 F.3d 1299, 1306-1307 (11th Cir. 2001).

Courts of appeals, too, "have long found it possible to separate factual from legal matters." *Teva Pharm. USA, Inc.* v. *Sandoz, Inc.*, 574 U.S. 318, 328 (2015). They both review district-court classifications and distinguish between factual and legal matters for themselves when deciding what standard of review to apply.

To be sure, there are hard cases at the margins. But even in cases involving mixed questions of law and fact, the principles for distinguishing legal and factual matters "are by now well established," *Miller* v. *Fenton*, 474 U.S. 104, 113 (1985), and generally concern whether a case "entails primarily legal or factual work," *U.S. Bank N.A.* v. *Village at Lakeridge*, 138 S. Ct. 960, 967 (2018). Compared to the complex questions that the Bureau's alternative theory would raise, *see* pp. 26-32, *infra*, the fact-law distinction in the FCRA places courts on familiar footing.

2.    The Bureau's warnings are especially unwarranted because courts around the country have already distinguished between fact and law for years in the FCRA context. *See* pp. 17-21, *supra*. The Bureau points (at 23-24) to two cases that supposedly show courts are struggling, but neither case does so. In *Cornock* v. *Trans Union LLC*, 638 F. Supp. 2d 158 (D.N.H. 2009), the district court expressed some frustration with the exercise of distinguishing

between fact and law.  But *Cornock* was not a hard case:  the plaintiff could not show "any inaccuracy" because an arbitrator had already affirmed the plaintiff's debt.  *Id.* at 166.

The Bureau's reliance on *Chuluunbat* v. *Experian Information Solutions, Inc.*, 4 F.4th 562 (7th Cir. 2021), is even more puzzling, because the Seventh Circuit there accepted the very fact-law distinction that the Bureau rejects, *id.* at 567.  The Bureau emphasizes that the decision was a consolidated appeal and the district courts below supposedly diverged in how they viewed the underlying disputes.  But the district courts all reached consistent conclusions, even if their explanations varied in immaterial ways:  they all found that CRAs were not required to adjudicate the dispute, whether because it was strictly legal, more legal than factual, or outside the competency of CRAs to resolve.  *Chuluunbat*, 4 F.4th at 566.  The Seventh Circuit affirmed across the board.  *Id.* at 569.

3.     Importantly, the existing regime does not, as the Bureau suggests (at 17), "categorically exempt" furnishers and CRAs from investigating all disputes that touch on legal issues or create an "exception that would swallow the rule."  Rather, the key question will usually be whether a court has already authoritatively adjudicated the consumer's dispute.  Once a court has ruled

24

that a consumer's debt is legally invalid, including information about that debt in a consumer's report may render the report "inaccurate" as a matter of objective fact. Thus, when a plaintiff points to a legal dispute that has already been adjudicated, furnishers and CRAs may be required to investigate "the status of the information contained in the public records." *Dennis* v. *BEH-1, LLC*, 520 F.3d 1066, 1069 (9th Cir. 2008) (citation omitted).

This Court's decision in *Losch* is illustrative. In that case, this Court explained that where the plaintiff could point to a court's judgment that left "no doubt that [the consumer's] mortgage was discharged," the dispute was not a legal one about "the validity of the underlying debt," but rather a factual inaccuracy: the report indicated that the consumer had an outstanding mortgage balance, but he no longer did. 995 F.3d at 946; *see Mader*, 56 F.4th at 271 (explaining that if "the bankruptcy court [had] specifically determined that Mader's loan was discharged," continued reporting of that loan "would present a very different case"). In that scenario, a furnisher or CRA need not "make any legal determinations about the underlying claim." *Chuluunbat*, 4 F.4th at 568.

*    *    *

25

The point is not that the analysis of fact and law is easy in every case. There will no doubt be some hard questions. The point instead is that this distinction is firmly embedded in the American legal tradition and is familiar to every federal court in the country. It is not, as the Bureau suggests (at 25), "an unworkable standard" ginned up to "encourage the evasion" of the FCRA.

## B.    The Bureau's Approach Is Unsound

The elimination of the accepted fact-law distinction would prove unworkable, expensive, and inefficient in practice.

1.    As a threshold matter, the regime that Plaintiffs and the Bureau envisions will be unadministrable. Furnishers and CRAs are "neither qualified nor obligated to resolve" legal disputes. *DeAndrade*, 523 F.3d at 68. Personnel responsible for responding to disputed information in credit reports are not typically lawyers, let alone judges. Yet under the alternative regime, they would need to resolve a host of extraordinarily complex legal questions— and get the answers right, on pain of suit.

Consider, for example, the *Denan* case in the Seventh Circuit. There, the legal validity of the plaintiffs' loans turned on three complex legal issues: (1) the enforceability of choice-of-law provisions in the plaintiffs' loan agreements; (2) whether, under the applicable state law, plaintiffs' loans were

26

void; and (3) whether, even if state law would otherwise void the loans, tribal sovereign immunity applied.  959 F.3d at 295.  Those are difficult questions even for courts.  Expecting credit personnel—especially those with no legal training—to resolve them borders on the absurd.  As the Seventh Circuit recognized, addressing complex legal questions "exceeds the competencies of consumer reporting agencies."  *Denan*, 959 F.3d at 295.  The same goes for furnishers.

Nor was *Denan* an outlier.  In *Mader*, the plaintiff argued that a debt should have been discharged in bankruptcy, which "turn[ed] on the unsettled meaning of the word 'program'" in a different Bankruptcy Code provision.  56 F.4th at 269.  In *Humphrey* v. *Trans Union LLC*, 759 Fed. Appx. 484, 485 (7th Cir. 2019), the plaintiff argued that a debt was invalid under federal regulations because of a pending application for a disability discharge.  *DeAndrade* concerned whether mortgage documents with an allegedly forged signature were nevertheless valid under the doctrine of ratification.  523 F.3d at 63.  *Gross* involved the application of Arizona's Anti-Deficiency Statute, and an Arizona Supreme Court decision interpreting that statute, to the plaintiff's debt.  33 F.4th at 1251-1252.

In this case, the legal validity of Plaintiffs' debts involves competing interpretations of their timeshare contracts. Plaintiffs deny responsibility for their debts because they believe that their defaults relieved them of ongoing responsibility under a liquidated-damages provision of the timeshare purchase agreements. *See* Br. 9-14. Holiday Inn, meanwhile, contends that the liquidated-damages provision applies only to defaults under the purchase agreement itself, and that Plaintiffs defaulted under their separate loan agreements. *See* Br. 25-27. Florida courts have adopted competing interpretations about nearly identical liquidated-damages provisions, and Florida's high court has not yet settled the matter. *Compare Orange Lake Country Club, Inc.* v. *Arndt*, 2016-CA-6342 (Fla. 9th Cir. Ct. Aug. 14, 2019), *with Holiday Inn Club Vacations, Inc.* v. *Granger*, 2018-CA-011778-O (Fla. 9th Cir. Ct. Mar. 15, 2021).

Neither Plaintiffs nor the Bureau ever explains exactly what Holiday Inn was supposed to do with those competing legal arguments, which have divided Florida courts, other than accede to Plaintiffs' view of the law. Plaintiffs go so far as to suggest (at 30-31) that because of the "legal nature of the dispute," Holiday Inn was required to conclude that it "could not verify the information" and to immediately stop reporting it. But that is precisely the

28

problem with Plaintiffs' theory:  a legally disputed debt *cannot* be objectively "verified," even after consulting lawyers.  15 U.S.C. § 1681s-2(b)(1)(E).  The upshot of Plaintiffs' argument is thus that any time an individual wishes to remove a debt from her credit file, she need only contest its legal validity.  Even if the furnisher reasonably believes that the debt is valid, further reporting of the debt becomes an FCRA violation.  That is not the regime that Congress enacted.

2.    The regime that Plaintiffs and the Bureau propose also would be expensive.  To avoid liability, furnishers and CRAs might feel obligated to expand their in-house legal teams to ensure that legal disputes in credit reports are all reviewed by a qualified lawyer.  And the lawyers reviewing those reports would need to be trained in a host of disparate subject areas, so that they could spot and analyze legal issues.  If the existing FCRA cases are any indication, furnishers' and CRAs' lawyers would need to be trained in federal disability law, state statutory law, contract law, tax law, and even tribal sovereign immunity.  Imposing such requirement on furnishers and CRAs would, of course, "substantially increase the cost of their services."  *Wright*, 805 F.3d at 1241 (rejecting interpretation of the FCRA that would require CRAs to employ tax-law experts).  Furnishers and CRAs would also need to

spend significant resources addressing frivolous claims, which distract from legitimate disputes. Those increased costs would "outweigh[]" the minimal "potential of harm to consumers" from leaving legal disputes to courts. *Id.*

Converting the FCRA into a vehicle to dispute the legal validity of underlying debts would also result in massive increases in litigation. FCRA suits already have "more than doubled in the last decade." Ben Kochman, *Fair Credit Reporting Act Suits Have Soared Over Last Decade*, Law 360 (Oct. 22, 2019), https://www.law360.com/articles/1210252/fair-credit-reporting-act-suits-have-soared-over-last-decade. FCRA suits not only are costly to litigate, but they also carry significant potential liability, because the statute permits plaintiffs to recover statutory damages, costs and attorney's fees, and even perhaps punitive damages. 15 U.S.C. §§ 1681n(a), 1681o(a). When plaintiffs proceed as a class, an FCRA defendant's liability may be astronomical. *See Trans Union LLC* v. *FTC*, 536 U.S. 915, 917 (2002) (Kennedy, J., dissenting from denial of cert.) ("Because the FCRA provides for statutory damages of between $100 and $1,000 for each willful violation, petitioner faces potential liability approaching $190 billion.").

To avoid that exposure, furnishers and CRAs might err on the side of omitting information from a consumer's file if it is subject to any possible legal

debate, including negative information that is factually accurate. That approach would have sweeping economic consequences as well. After all, "the very economic purpose for credit reporting companies would be significantly vitiated if they shaded every credit history in their files in the best possible light for the consumer." *Cahlin* v. *General Motors Acceptance Corp.*, 936 F.2d 1151, 1158 (11th Cir. 1991). The reliability of the national credit-reporting industry has enabled modern creditors to extend far more credit to consumers, including to consumers with whom they have no prior experience. *See* Consumer Financial Protection Bureau, 1 *Taskforce on Federal Consumer Financial Law Report* 103 (Jan. 2021), https://files.consumerfinance.gov/f/documents/cfpb_taskforce-federal-consumer-financial-law_report-volume-1_2022-01_amended.pdf. This "democratiz[ation]" of consumer lending, *id.* at 24, has greatly benefited consumers and the American economy. If credit reports became categorically less reliable because they omit subjects of any legal dispute, that would have repercussions for CRAs, for furnishers, and for the wide variety of lenders and other businesses that rely on them—and ultimately for consumers.

3.    Finally, the Bureau's proposed approach would be inefficient. As discussed above, "[o]nly a court can fully and finally resolve the legal question

of a loan's validity." *Denan*, 959 F.3d at 295. Yet the Bureau's theory would put furnishers and CRAs in the position of defending the legal validity of a consumer's debts when the creditor that actually has a financial stake might be absent. CRAs are not creditors. And although furnishers are often the creditors, that is not always true. Debt collectors, for example, are furnishers too. *See McIvor* v. *Credit Control Servs., Inc.*, 773 F.3d 909, 915 (8th Cir. 2014). It makes little sense to treat the credit-reporting scheme under the FCRA as a mechanism for collateral attacks on the legality of certain debts, with an entity that may not be the creditor acting as the defendant in subsequent FCRA litigation.

The correct path for handling legally contested debts is far more straightforward: if a consumer wants a debt deemed unenforceable, she should go to court and ask the court to say so. If the court agrees, the legal question is resolved, the debt is no good, and a furnisher or CRA who fails to conduct a reasonable investigation to catch the adjudication and lists it as outstanding commits a factual error for which it may be penalized under the FCRA.

## CONCLUSION

For the foregoing reasons, the judgments of the district courts should be affirmed.

Respectfully submitted,

s/ Jeffrey B. Wall

JEFFREY B. WALL
MORGAN L. RATNER
ZOE A. JACOBY
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW, Suite 700
Washington, DC 20006
(202) 956-7500
wallj@sullcrom.com

TARA S. MORRISSEY
JANET GALERIA
U.S. CHAMBER LITIGATION CENTER
1615 H Street NW
Washington, DC 20062
(202) 463-5337

THOMAS PINDER
AMERICAN BANKERS ASSOCIATION
1120 Connecticut Avenue NW
Washington, DC 20036
(202) 663-5035

ANN C. PETROS
NATIONAL ASSOCIATION OF
FEDERALLY-INSURED CREDIT UNIONS
3138 10th Street N
Arlington, VA 22201
(703) 842-2212

33

MICHAEL EMANCIPATOR
INDEPENDENT COMMUNITY BANKERS
OF AMERICA
1615 L Street NW, Suite 900
Washington, DC 20036
(202) 821-4469

PHILIP BOHI
AMERICAN FINANCIAL SERVICES
ASSOCIATION
919 18th Street NW, Suite 300
Washington, DC 20006
(202) 466-8605

ALEXANDER MONTERRUBIO
CREDIT UNION NATIONAL ASSOCIATION
99 M Street SE, Suite 300
Washington, DC 20003
(202) 525-8558

JUSTIN WISEMAN
MORTGAGE BANKERS ASSOCIATION
1919 M Street NW
Washington, DC 20036
(202) 557-2854

DAVID POMMEREHN
CONSUMER BANKERS ASSOCIATION
1225 New York Avenue NW, Suite 1100
Washington, DC 20005
(202) 552-6368

FEBRUARY 15, 2023

## CERTIFICATE OF COMPLIANCE

This brief complies with Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,500 words.

This brief also complies with the requirements of Federal Rule of Appellate Procedure 32(a) because it was prepared in 14-point font using a proportionally spaced typeface.

s/ Jeffrey B. Wall
JEFFREY B. WALL

FEBRUARY 15, 2023

## CERTIFICATE OF SERVICE

I certify that on February 15, 2023, the foregoing brief was filed electronically with the Clerk of Court using the Court's CM/ECF system. I further certify that all parties required to be served have been served.

s/ Jeffrey B. Wall
JEFFREY B. WALL

FEBRUARY 15, 2023